IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

FRANK T. WHITEHEAD,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION AND ORDER |
| v. | | |
| | | 17-cv-514-wmc |
| MR. HINCHLEY, OFFICER THORNE and | | |
| UNIT MANAGER FLADHAMMER, | | |
| | Defendants. | |

*Pro se* plaintiff Frank T. Whitehead, an inmate at New Lisbon Correctional Institution ("NLCI"), was granted leave to proceed on claims sounding under the Eighth Amendment and Wisconsin tort law for deliberate indifference and negligence arising out of his consumption of contaminated peanut butter against defendants Christopher Thorne and Jassen Hinchley, as well as a retaliation claim against defendant Diane Fladhammer under the First Amendment for allegedly firing him from his prison job because of his pursuit of those contamination claims. Now before the court is defendants' motion for summary judgment. (Dkt. #54.) For the reasons that follow, the court will grant defendants' motion and enter final judgment in their favor.

UNDISPUTED FACTS[1]

A. Parties

Plaintiff Frank Whitehead was incarcerated at NLCI when the events comprising

---

[1] The court has drawn the following facts from the parties' proposed findings of fact and responses, as well as the evidence cited in support or opposition to those proposed findings of fact as appropriate. In particular, while Whitehead purports to dispute many of defendants' proposed findings of fact, the majority of his disputes fail to cite contrary evidence of record and instead take issue with defendants' characterizations of the evidence or argue the merits of his claims. These assertions do not necessarily create material disputes of fact unless they could be construed as

his claims in this lawsuit took place, in April of 2017, which is also where all three defendants were working at the time. Defendant Jassen Hinchley was the Food Service Manager at NLCI during the relevant time period. From April to May of 2017, Hinchley served as both the Food Services Manager and Administrator. Defendant Christopher Thorne was working as a food service officer, and he was responsible for maintaining the safety and security of the institution, prisoners and staff by enforcement of Wisconsin Department of Corrections ("DOC") policies and procedures in the kitchen. Civilian food service staff, not food service officers, were responsible for ensuring food quality, portion size and food safety. Defendant Diane Fladhammer was a Unit Manager at NLCI during the relevant time period. She has held this position since June 27, 2016.

### B. Contaminated Peanut Butter

The peanut butter that is the subject of this lawsuit was manufactured by Hampton Farms and distributed by Indianhead Foods to NLCI under the label "Lot #200-7-068." NLCI received this peanut butter from Indianhead sometime before April 24, 2017. On April 24, food service staff informed NLCI's Food Service Manager Hinchley that the peanut butter tasted "different." Hinchley then sampled the peanut butter by scooping out a portion using a spoon and eating it. Hinchley described the peanut as having a "darker, burnt taste," but he did not get sick from eating it.

That same morning, April 24, Hinchley also sent an email to Corbet Peterson, an

---

reasonable by the trier of fact. Moreover, they are mainly taken up in the next section of this decision. That said, since Whitehead submitted his own declaration (*see* dkt. #73), the court has considered his averments if arguably within his personal knowledge.

Indianhead account representative, asking if anyone else was reporting problems with the peanut butter. Hinchley further sent an email to NLCI sergeants, explaining that (1) there had been complaints about the peanut butter and (2) he had contacted Indianhead about it. Two days later, on April 26, Hinchley sent Peterson a second, follow-up email, to which Peterson responded that he had not heard concerns from other facilities, but that he had forwarded Hinchley's concerns to the manufacturer.

Two days after Hinchly received that response, on April 28, NLCI served the peanut butter as part of the prisoners' breakfast meal. While Hinchley was aware there was a general consensus among prisoners that the peanut butter tasted different (and, presumably, bad), no one had informed Hinchley before its service that the peanut butter was unsafe for consumption. Hinchley explained his view at the time was that if the peanut butter manufacturer had deemed the peanut butter unsafe, the manufacturer would have issued an official recall notice and sent it to the DOC's central office, as well as each affected institution. Thus, because no recall notice had been sent, Hinchley believed the peanut butter was unsafe for consumption.

After breakfast service on April 28, however, there was a flurry of emails between DOC employees about prisoners' reactions to the peanut butter. At 10:56 a.m., a DOC employee named Traci Navis emailed Hinchley asking if he had heard anything about the peanut butter because inmates were complaining that it tasted "like there were chemicals in it." Hinchley responded at 11 a.m. that he had contacted the food distributor and seen emails from other institutions discussing the peanut butter, adding that he had tasted the peanut butter and had not heard that it was unsafe, just that it had a different, darker and burnt taste. (Hinchley Decl. Ex. 1000 (dkt. #60-1) 12.)

At 12:21 p.m., Sally Wess, NLCI's Correctional Management Services Director, sent an email to DOC's Dietetic Services Director Christine Berndt Miles, on which Hinchley was copied, stating:

> Chris, we are having a lot of complaints with our peanut butter and it is causing a climate issue. Jassen [Hinchley] said he has contacted [Indianhead] with the lot number. We can't serve it, so will be looking at alternatives.

(Hinchley Decl. Ex. 1000 (dkt. #60-1) 12.) Berndt Miles also forwarded that message to Indianhead contract manager Jim Kacvinsky, writing "It's a problem when inmates get upset. WCI described the aftertaste to be that of moldy peanuts. I'm not OK with this, nor are some of our institutions. We're going to have to work something out." (*Id.* at 20-21.)

At around 1 p.m. on April 28, Hinchley also sent an email to NLCI's Inventory Control Coordinator, Joseph Erler, asking him to check if the stock of peanut butter was from the same lot as the peanut butter that had been served in the morning (Lot #200-7-068). Hinchley noted in particular that they were having "some major quality concerns" with the peanut butter. However, Hinchley maintains he sent this email still out of concern about the taste of the peanut butter, not out of concern that it was unsafe. When Erler responded that all the peanut butter was from Lot #200-7-068, Hinchley called Indianhead to exchange that peanut butter for new product.

At 3:08 p.m., Jim Kacvinsky emailed Hinchley, copying multiple DOC employees, advising that any facility having issues with peanut butter from Lot #200-7-068 could return it for credit and replacement by contacting the Indianhead account representative Peterson or customer service. Peterson then agreed to swap out NLCI's peanut butter from

that Lot with new peanut butter to be delivered May 2, 2017.  Peterson memorialized that agreement in an email that afternoon.

At about 3:30 p.m., still on April 28, Berndt Miles circulated an email to all DOC Food Service Administrators and Managers, stating that while Indianhead had said the product was fine, they reconsidered and would allow facilities to return the peanut butter from Lot #200-7-068 for credit and replacement.  (*Id.* at 20.)  Again, according to Hinchley, he understood that Indianhead made this decision to maintain its positive working relationship with the DOC, not because the peanut butter from Lot #200-7-068 was unsafe for consumption.

On May 2, 2017, Hinchley informed NLCI staff that new peanut butter was arriving that day, but that the old product would remain available during breakfast for the next few days.  Hinchley explained in an email to one correctional officer that he "was informed that it [was] perfectly safe to eat."  (Hinchley Decl. Ex. 1000 (dkt. #60-1) 23.)  Therefore, on the morning of May 2, NLCI again served peanut butter from Lot #200-7-068 for breakfast.  However, Hinchley told NLCI kitchen staff to offer jelly and butter as a temporary substitute for prisoners who did not want to eat the peanut butter.  While plaintiff Whitehead claims that he personally was never offered this alternative, Whitehead has submitted no evidence suggesting that it was not offered to others, nor that Hinchley failed to issue this directive.

In May of 2017, Inmate Complaint Examiner  ("ICE") Tara Fredlund contacted Hinchley about several inmate complaints related to the peanut butter.  Hinchley explained what happened and forwarded to her the email chain between Wess, Berdt Miles and Kacvinsky that resulted in Indianhead offering to take back the Lot #200-7-068

peanut butter. After reviewing these emails, Miller recommended that the complaint be affirmed because the DOC initially received peanut butter that had been "recalled" by Indianhead, although Miller explains in her declaration that in using the word "recalled," she neither meant to suggest that the peanut butter was unsafe nor that it had been "recalled" out of health concerns. In particular, Miller avers that she did not conclude nor believe that the peanut butter was contaminated, poisoned or dangerous.

### C. Whitehead's Exposure to the Lot #200-7-068 Peanut Butter

During the breakfast on April 28, 2017, when NLCI first served peanut better from Lot #200-7-068, Whitehead ate it and told defendant Thorne as a food service officer about the bad tasting peanut butter. Thorne in turn notified the unit sergeant, who contacted the main kitchen and civilian food service staff to notify them of the complaints. The kitchen staff then reported back that the peanut butter was safe for consumption, relaying that it tasted and looked different because the peanuts had been roasted differently. Therefore, Whitehead was given the option to either eat the peanut butter or throw it away. Nevertheless, Whitehead claims that the peanut butter made him sick.

While Thorne was assigned to the kitchen, he was not a food service employee and did not decide what food is or is not served. Thus, Thorne was not involved in any decisions about whether to serve the peanut butter. His responsibility was limited to relaying prisoner complaints about food to food service employees and then communicating the response back to the prisoners.

As both the Food Service Manager and Administrator, Hinchley also spoke to plaintiff Whitehead on April 28. Hinchley claims he told Whitehead that the situation

would be resolved as soon as possible, since he was working on replacing the peanut butter. In contrast, Whitehead claims that Hinchley never mentioned the possibility of a replacement.

On May 2, 2017, Whitehead again ate the peanut butter during breakfast, and again complained to Thorne that he needed to do something about it or Whitehead would write an inmate complaint. According to Whitehead, Thorne told him to write an inmate complaint if he wished. While Thorne does not recall this encounter, he agrees that it may have happened that way, since Thorne had previously confirmed with kitchen staff that the peanut butter was safe, but would also have understood Whitehead to be within his rights to pursue an inmate complaint about their interaction.

### D. Whitehead's Health Issues

Whitehead claims that he spoke with a Nurse Dobbert on April 29 and May 3, complaining he was sick from consuming the subject peanut butter, and she told him to drink water to flush it all out. Whitehead also claims that Nurse Dobbert gave him Mucilax sometime between May 30 and June 26 of 2017.

Defendants have no record that Whitehead asked to be seen through a Health Services Request ("HSR") anytime in May of 2017. Whitehead explains that he did not complain about his illness during that period of time out of fear he would be put in restrictive housing, which he wanted to avoid because he needed to work on a motion for a different state court proceeding.

On June 9, 2017, Whitehead met with Dr. Karl Hoffman in the HSU for an appointment related to other, ongoing issues -- a cyst in his thumb and chronic left knee

pain.[2]  While Dr. Hoffman's progress notes did not include an entry that Whitehead was having stomach issues or was sick, he claims to have told Hoffman about his stomach issues during that visit and that Hoffman told him to contact someone from the Psychological Services Unit ("PSU").

On June 25, 2017, Whitehead did fill out an HSR, asking for a knee sleeve and reporting that he was "afraid to eat the peanut butter [be]cause of the bad peanut butter given on (4-28-2017) and (5-2-2017) and other days."  (Pl. Ex. 2001-1 (dkt. #69-3).) Whitehead was further seen in HSU on July 3 and 18, 2017, related to his thumb cyst and knee, but again Hoffman's notes from those examinations do not mention nausea, vomiting, weight loss or any other stomach-related symptoms.  Nevertheless, Whitehead claims that he submitted a later HSR on July 7, 2017, complaining that he had been served peanut butter on April 28 and May 2 that left him:  "very ill" and "with the runs, throwing up all messed up in a bad way.  I now still feel today like something is wrong."  (Whitehead Decl. (dkt. #73) ¶ 18; Pl. Ex. 2001-5 (dkt. #69-7).)

Whitehead also submitted another HSR, dated July 14, 2017, in which he asked that his blood be checked because "something was in the peanut butter served to me and all the other inmates . . . what it was has me not having a[n] erection and very scared."  (Pl. Ex. 2001-4 (dkt. #69-6).)   Dr. Hoffman responded to Whitehead's July 14 HSR on July 19 as follows:  "Does not seem logical.  I am not ordering any tests with this presenting

---

[2]  Whitehead's proposed findings of facts include numerous, unsupported assertions challenging Dr. Hoffman's ability to opine about Whitehead's medical condition and implying that Hoffman would lie on behalf of his fellow DOC and NLCI employees.  (Pl. Proposed Findings of Fact (dkt. #71) ¶¶ 1-8.)  Given that Whitehead submitted *no* evidence to support either contention, the court will give them no weight, except with respect to his specific claim that he told Hoffman about his stomach issues.

complaint." (*Id.*)  A week later, on July 24, 2017, Whitehead submitted a third HSR, which stated:

> I am going mentally insane by all this, toe nails falling off, vomiting, stomach upset, runs, not getting arousal from looking at my lady flicks, or anything for that matter, rash on my arm for like a month now, and you will not tell me what was in that peanut butter that was and still is got me sick.  Why?  Why?  Why?  That is a demand you find out, or I t[e]ll the court you are denying me medical treatment as you are.

(Hoffman Decl. Ex. 1001 (dkt. #61-1) 61.)  In response, Dr. Hoffman again recommended that Whitehead seek treatment from psychology, and he scheduled him for an appointment to assess his physical symptoms.  In Dr. Hoffman's opinion, Whitehead's symptoms were caused by mental health issues, not the peanut butter he had eaten nearly three months earlier.

On July 26, 2017, Whitehead next had an appointment with a nurse, during which he apparently reported that his symptoms started in or around March, after he ate some "bad peanut butter."  While the nurse was unable to see a rash or any signs of infection, she did note that Whitehead had lost eight pounds over a five-month period and that he had lost part of his left big toenail.  (Hoffman Decl. Ex. 1001 (dkt. #61-1) 6.) Nevertheless, Whitehead now claims that the nurse refused to talk to him about the peanut butter or run a test of his blood.  Dr. Hoffman's opinion is that none of the issues discussed during the July 26 meeting would have been related to food Whitehead consumed on April 28 or May 2, explaining credibly that if food is contaminated or contains a food borne illness, symptoms begin as early as two hours after consumption (for food containing a staph infection), and may take up to a month (for food containing a parasite).

On August 3, 2017, Dr. Hoffman started treating Whitehead for suspected irritable

bowel syndrome. On August 18, he also ordered a stool sample test for C-Diff and ova/parasites.[3] The sample was collected August 22, 2017, but the C. Diff test could not be performed due to an improper specimen. However, the ova/parasites test identified a non-pathogenic parasite (endolimax nana) from fecally contaminated food or water. The test also showed blastocystis hominis. As a result, Dr. Hoffman concluded that Whitehead had a parasite that was causing his symptoms. He also noted that: (1) blastocystis hominis may either be normal bowel flora or a true pathogen; and (2) symptoms of endolimax nana and blastocystis hominis appear within days or weeks of contamination, not months. In response, Dr. Hoffman prescribed Whitehead metronidazole.

As Food Service Manager and Administrator, defendant Hinchley is not aware that any other prisoner claimed to have become sick from eating the peanut butter. However, Whitehead submitted a declaration from another prisoner, Paul Ruegg, Jr., who avers that he ate the peanut butter, which had a "chemical taste," was "bad" and made him "sick the first time [he] tasted it." (Ruegg Decl. (dkt. #75) 1.) He also submitted a declaration from Todd Peterson, a prisoner working in NLCI's kitchen during the relevant time period, who avers that he heard from "staff and other inmates" that the peanut butter was bad tasting, contaminated and made people sick. (Peterson Decl. (dkt. #76).)


### E. Whitehead's Termination from his Prison Job

On or about July 23, 2017, Sergeant Drew Cross hired Whitehead to position D-113, which is a Personal Care Assistant 2. He held that position until September 9, 2017,

---

[3] "C-Diff," or c. difficile infection, a bacterium that causes a range of symptoms, including diarrhea, while "ova/parasites" refers parasites that may cause infections in the digestive tract.

when he was terminated.

Whitehead claims that on September 5, 2017, defendant Fladhammer, a Unit Manager at NLCI, threatened to fire him from his position. During his deposition, Whitehead testified that while he was working that day, Fladhammer saw him and asked why he was out of his cell, to which Whitehead responded that he was working. Apparently, this angered Fladhammer, who then stated: "You will not work for us and sue us, that will end soon." (Rachhuber Decl Ex. 1012 (dkt. #65-1) 4.) Whitehead further testified that Fladhammer later apologized for her statements. For her part, Fladhammer denies ever threatening to fire Whitehead on September 5, 2017.

Whitehead further testified in his deposition that on September 9, 2017 -- the same day he was terminated -- he overheard Fladhammer call Sergeant Cross into her office and instruct him to fire Whitehead, saying "you hired him, now you fire him." (Bachhuber Decl. Ex. 1012 (dkt. #65-1) 6.) Fladhammer denies making this statement as well, and it is undisputed that Fladhammer was not working on September 9, 2017. In his opposition brief, Whitehead changes his story, claiming that he was mistaken, and he now remembers the conversation between Fladhammer and Cross happened on September 7, 2017.

Regardless of when that conversation allegedly took place, it is undisputed that on September 9, 2017, a non-defendant, Correctional Officer Sieber, issued Whitehead a conduct report for disobeying orders and theft. Sieber alleged that at approximately 5:00 p.m. on September 9, 2017, he observed Whitehead take toast and bacon back to his cell in a snack bag. Sieber further alleges that (1) he retrieved the snack bag from Whitehead's cell and (2) this was not the first instance Whitehead had been talked to about bringing food back to his cell. Neither Cross nor Fladhammer observed the events Sieber described

in the conduct report, nor did they instruct Sieber to write the conduct report. Moreover, Whitehead did not contest the conduct report and submitted no evidence suggesting either Cross or Fladhammer were involved in the resolution of that conduct report.

Also on September 9, *Sieber* decided to conduct a work evaluation for Whitehead, which he was permitted to perform at any time. Having worked on Whitehead's unit consistently for the 6-month period leading up to September 9, Sieber also avers that he felt he had the opportunity to observe Whitehead's behavior while he was working. In particular, Sieber explains that the Offender Performance Evaluation allows staff to evaluate prisoners on different areas related to attitude, performance and initiative, all on a scale of 0-3, with 33 points possible. Once the scores are tallied, points are deducted for conduct reports. Prisoners must score over 19 points -- attaining a rating of satisfactory or above average -- to work on the unit.

Sieber gave Whitehead a total of 9 points, and then deducted 3 points for the September 9, 2017, conduct report. Because Sieber chose not to deduct any points for three other conduct reports Whitehead had received in 2017, Whitehead's final score was 6 points. Since his total points resulted in an "unsatisfactory" rating, Whitehead was subject to termination, and it was Sieber who, in fact, terminated him. On September 11, 2017, June Trepis from the NLCI business office signed off on Whitehead's termination. Finally, conduct reports, work evaluations and employment terminations can occur even in the unit manager's absence.

Again, there is no evidence either Cross nor Fladhammer were involved in deciding to evaluate, rating or terminating Whitehead. Fladhammer affirmatively avers that she never instructed *any* NLCI employee to fire Whitehead from his job, although Whitehead

purports to dispute this based on the September 7 conversation he purports to have overheard between Cross and Fladhammer. Whitehead also points to an October 6, 2017, letter he received from NLCI's Correctional Manager Services Director Sally Wess after his termination. Whitehead had complained about his termination, and Wess responded that the termination was proper. In the letter, Wess also relayed that Fladhammer was not involved in the termination, although Wess reported that she spoke with Fladhammer, who agreed with the termination decision. (Fladhammer Decl. Ex. 1009 (dkt. #63-3) 7.) While Wess noted that Fladhammer would need to sign the termination form as a formality to comply with policy in her position as Unit Manager, Wess further reaffirmed that the termination was based on Sieber's unsatisfactory evaluation. (*Id.*)

Whitehead filed this lawsuit on July 5, 2017, before the events giving rise to his termination took place. Whitehead amended his complaint to include Fladhammer as a defendant on December 27, 2017. Fladhammer avers that as of September 2017, she was not aware that Whitehead had filed this lawsuit, and she only learned about it sometime after November 1, 2018, when she received a notification that a lawsuit had been commenced.

### F. Notice of Claim

Contrary to the requirements of Wis. Stat. § 893.82, the Office of the Attorney General neither received nor was served with a notice of claim on behalf of Whitehead against any of the defendants. Whitehead does not dispute that he did not file the required notice of claim, but claims not to have understood that he needed to take that step before filing claims against defendants.

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then to survive summary judgment, the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). Of course, at summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party.

However, importantly here, this treatment does not extend to inferences supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). Unfortunately, plaintiff's claims for deliberate indifference, negligence and retaliation depend largely on the latter, and when stripped away, the undisputed facts leave no basis for a reasonable jury to find against any of the named defendants.

## I.  Eighth Amendment

To prevail on an Eighth Amendment deliberate indifference claim, Whitehead must show that defendants were aware that he faced a substantial risk of serious harm, but were either "deliberately indifferent" or consciously refused to take reasonable measures to prevent the harm. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). A defendant "consciously disregards" a prisoner's need when the defendant knows of and disregards "an

excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). Inadvertent error, negligence, gross negligence and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). Defendants seek judgment in their favor on the grounds that Whitehead was not subjected to a substantial risk of serious harm and because neither defendant acted with deliberate indifference to such a risk. The court will address these arguments in turn.

### A. Substantial Risk of Serious Harm

Whitehead's evidence in support of his position that the peanut butter served to NLCI inmates on April 28 and May 2, 2017, created a substantial risk of serious harm consists of the comments he attributes to NLCI's Correctional Management Services Director Wess and DOC's Dietetic Services Director Miles, along with his own and one other prisoner's experiences. As an initial matter, the statements made by Sally Wess and Berndt Miles (as well as other DOC employees) in emails on April 28 do *not* support a finding, nor even suggest, that the peanut butter served from Lot #200-7-068 was unsafe for consumption. Instead, those communications relayed that there were complaints about the *taste* of the peanut butter to the point that everyone agreed that prisoners would not be served from that Lot anymore mainly, if not exclusively, to avoid prisoner unrest. Certainly, none of the comments suggest that prisoners would actually be *harmed* by consuming it. Nor do any of the communications from DOC employees to the Indianhead

employees, all of whom agreed that the peanut butter did not taste good and had burnt or chemical-like aftertaste, address any concern other than the taste of the peanut butter and the complaints that DOC staff were receiving from the prisoners about the taste. While there *may* well have been something wrong with the peanut butter (and it is unclear from the record exactly what was wrong with Lot #200-7-068), at least as to taste, there is *no* evidence of record indicating that the peanut butter was dangerous if consumed. As such, the only reasonable inference to be drawn from the communications about the peanut butter was that prisoners were complaining, and DOC staff wanted an exchange from Indianhead because they had dissatisfied customers.

Plaintiff's other evidence related to his own and one other prisoner's speculation and conjecture as to the reasons for their feeling ill only makes this a slightly closer call, at least at the summary judgment phase when the court must view the evidence in his favor. Starting with plaintiff, defendants' position is that it would be unreasonable to conclude that Whitehead was sickened by the peanut butter given overwhelming medical evidence to the contrary. First Whitehead did not even report his symptoms until June, and was not diagnosed with a parasite until the end of August. While Whitehead would explain away these problems by asserting that he complained to Nurse Dobbert about issues he was having with his stomach immediately after he consumed the peanut butter, contemporaneous medical records are to the contrary. As defendants point out in particular -- and Whitehead does not dispute -- he did not submit *any* HSR's complaining about those symptoms in the weeks following consumption of the peanut butter; indeed, it was only on June 25, 2017, that Whitehead started lodging complaints in HSR's about

how the peanut butter had made him sick.[4]

Second, defendants point out that when Dr. Hoffman met with Whitehead on July 3 and 18, he did not note any mention of the patient reporting any stomach-related ailments nor that he lost weight. Here, plaintiff claims that Dr. Hoffman was lying, while offering no evidence why Hoffman would do so. In fairness, plaintiff also insists that he was complaining about stomach-related issues to *other* NLCI staff members beyond Dobbert and was ultimately diagnosed with a parasite, after August 22, 2017, albeit four months from first consuming the peanut butter. However, according to Dr. Hoffman, if the peanut butter Whitehead consumed had contained the parasite, Whitehead would have presented with symptoms much earlier. Again, Whitehead responds that he *did* have those symptoms earlier and asked for testing to be done, but no one tested him for the parasite.

Certainly, Whitehead's explanations for his failure to use HSR's earlier to obtain treatment, as well as his insistence that Dr. Hoffman was lying, strain credulity and pose a substantial credibility hurdle for him to overcome at trial. However, the court's skepticism about Whitehead's explanations does not preclude an argument that his version of events goes to credibility determinations at this stage. *Townsend v. Fuchs*, 522 F.3d 765, 774 (7th Cir. 2008). As such, the court cannot completely discount Whitehead's insistent that he was experiencing digestive ailments in May of 2017.

Similarly, the substantial skepticism by Dr. Hoffman as to any ill affects to plaintiff

---

[4] Plaintiff's only explanation for this omission was that he was afraid to complain about his health because he did not want to be placed in restrictive housing, of course failing to explain what changed.

and the absence of more than a few anecdotes of any other inmate becoming ill moves the plaintiff's claim into the speculative category. Indeed, plaintiff submitted one affidavit from another prisoner (Ruegg), who avers that he also got sick from the peanut butter right after eating. While lacking any other support, and *no* medical support, the court could conclude as a matter of law that a jury would only be speculating the peanut butter made either prisoner sick, much less posed a *substantial* risk of serious harm. Even if this were not so, the court must also turn to whether either Dr. Hinchley or Thorne were *aware* that of the risk that the peanut butter constituted a serious risk of substantial harm if consumed *and* acted with deliberate indifference to that risk. On this element of plaintiff's claim, no reasonable jury could find against defendants.

### B. Deliberate Indifference

In particular, on this record, there is *no* evidence supporting a finding that Hinchley or Thorne acted with a "sufficiently culpable state of mind" in allowing Whitehead to consume the peanut butter. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). Starting with Hinchley, it is undisputed that he had no knowledge the Lot #200-7-068 peanut butter posed a safety risk before breakfast on either April 28 or May 2, 2017. Certainly, Hinchley learned that the peanut butter tasted unusual (and a reasonable jury might even infer unpleasant) on April 24, after which Hinchley personally tasted it, acknowledged the burnt taste and darker color, but did not get sick. He then took several steps to ensure that the different taste and color were not red flags that the peanut butter was unsafe for consumption, including reaching out to other institutions and the distributor Indianhead directly, explicitly asking the

Indianhead account representative, Corbet Peterson, whether there were issues with the Lot #200-8-068 peanut butter that NLCI and other DOC facilities should know about. Moreover, Hinchley heard back from Indianhead via an email from Peterson *on April 26*, two days before the peanut butter was served at NLCI, advising that there were no concerns with that peanut butter Lot. Whether correct or not, on this record, it would be unreasonable to infer that Hinchley had reason to believe that serving the peanut butter on April 28 posed a substantial risk of serious harm.

As for Hinchley's decision to allow prisoners to eat peanut butter from Lot #200-7-068 *after* deciding to send back their supply from that lot number, the evidence of record establishes that Hinchley again had no reason to believe prisoners would get sick if they consumed that peanut butter. Indeed, none of the evidence of record would permit a reasonable jury to find that by May 2, someone from the manufacturer, Hampton Farms, or the distributor, Indianhead, believed that the peanut butter was unsafe, much less that *Hinchley* was aware of a substantial risk that prisoners would actually get *sick* from consuming it. While Whitehead might fault Hinchley for declining to pull the Lot #200-7-068 peanut butter on April 28 based on the non-obvious chance that the problem was more severe than just the taste of the peanut butter, there is no evidentiary basis to question that Hinchley based this decision on an understanding that the peanut butter was safe. Rather, on May 2, Hinchley emailed a staff member to replay his understanding that the peanut butter was safe. (*See* Hinchley Decl. ¶ 23; Hinchley Decl. Ex. 1000 (dkt. #60-1) 23.) Even viewing Hinchley's decision-making process in a light favorable to Whitehead, a reasonable trier of fact could simply not conclude that his actions were "the equivalent of criminal recklessness." *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir.

19

2007).[5]

As for Thorne, his involvement was even more limited, and it is essentially undisputed that he lacked the authority to influence whether the peanut butter would be made available to the prisoners, although he may have had some duty to report up the chain of command if he believed a real risk of harm existed to the inmates. Regardless, while Whitehead insists that Thorne knew that there were problems with the peanut butter, the *only* complaint Whitehead lodged about the peanut butter with Thorne was that it *tasted* bad, *and* Thorne took appropriate action by informing the kitchen staff about his complaint. Moreover, Thorne -- who was not part of NLCI's food service department and worked as a correctional officer -- had no basis to disbelieve the kitchen staff's response that the peanut butter was safe. Accordingly, it would be unreasonable to infer that Thorne responded to Whitehead's complaint with reckless disregard of the possibility that the peanut butter was unsafe for consumption.

Since no reasonable trier of fact could conclude that either defendant Hinchley or Thorne acted with reckless disregard to a risk that Whitehead or other inmates would suffer serious harm by eating the peanut butter on either April 28 or May 2, the court must grant defendants motion of the Eighth Amendment claims against them.[6]

## II. Wisconsin Negligence

To bring a claim of negligence against a state employee, a plaintiff must comply

---

[5] Again, at this point, not even plaintiff *Whitehead* had reported to Hinchley that the peanut butter had made him sick, much less that he sought medical treatment for symptoms he was suffering after consuming the peanut butter.

[6] While defendants also raise qualified immunity as a defense, the court need not resolve that argument in light of its findings.

with Wisconsin's notice of claim statute, Wis. Stat. § 893.82, by notifying the attorney general about his state law claims. Specifically, § 893.82(3) requires a claimant in a civil action to serve the attorney general written notice of the circumstances of his claim by certified mail within 120 days of the event causing the injury, including "the name of the state officer, employee or agent involved." In addition, strict compliance with the statute is a *jurisdictional* requirement for a state law claim to proceed against a state employee. *Sorenson v. Batchelder*, 2016 WI 34, ¶ 30, 368 Wis. 2d 140, 154, 885 N.W.2d 362, 368 (citing Wis. Stat. § 893.82(2m)); *Ibrahim v. Samore*, 118 Wis. 2d 720, 726, 348 N.W.2d 554, 558 (1984). *See also Weinberger v. Wisconsin*, 105 F.3d 1182, 1188 (7th Cir. 1997) ("Section 893.82 is jurisdictional and strict compliance is required.").

Since Whitehead does not dispute that he failed to file a notice of claim with respect to his negligence claims against Hinchley and Thorne, this court cannot consider his negligence claim. While Whitehead urges the court to ignore this requirement in consideration of his *pro se* status, the fact remains that the notice of claim is a jurisdictional prerequisite to suit. Accordingly, the court will grant defendants' request for judgment on Whitehead's negligence claims against Hinchley and Thorne.[7]


III.    **First Amendment**

At the summary judgment stage, a plaintiff "must 'show through specific evidence that a triable issue of fact remains.'" *Johnson v. Kingston*, 292 F. Supp. 2d 1146, 1158 (W.D. Wis. 2003) (quoting *Liu v. T & H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir. 1999)).

---

[7]  Even if the claim were not barred, the court would be remiss not to express skepticism about its merits as to both lack of adequate care and causation.

Plaintiff's "subjective belief that the action was retaliatory . . . does not alone create a genuine issue of material fact." *Johnson v. Univ. of Wisconsin-Eau Claire*, 70 F.3d 469, 480 (7th Cir. 1995), *abrogated on other grounds by Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004). To state a prima facie case for retaliation under § 1983, plaintiff must produce sufficient evidence for a reasonable jury to conclude that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).

The parties agree here that Whitehead's retaliation claim involves a protected activity *and* that Whitehead's termination is sufficiently adverse to deter a prisoner of ordinary firmness from filing a lawsuit again in the future. Defendants' motion, therefore, turns on whether there is sufficient evidence of record to support a reasonable finding in Whitehead's favor on the third element -- that his complaint about the service of allegedly tainted peanut butter was at least a motivating factor in his being fired from his prison job. Again, unfortunately for plaintiff, he has failed to meet this burden.

To start, defendants' position is that Fladhammer did not know about this lawsuit on September 9, 2017, when Whitehead was terminated, which is significant since a plaintiff must prove that the defendant knew of the protected conduct before the alleged retaliatory action. *See Wackett v. City of Beaver Dam*, 642 F.3d 578, 582 (7th Cir. 2011) ("For a viable case, [plaintiff] must prove defendants' knowledge of the protected speech to establish retaliation."). Specifically, Fladhammer claims in a declaration that she did

not know about it until November of 2018. However, Whitehead testified in his deposition that Fladhammer told him on September 5 that he could not "sue us and work for us," and he believes she knew about his lawsuit because she used the term "us." He also suggests that she heard about the lawsuit from other NLCI staff or prisoners. Standing alone, Whitehead's speculation that Fladhammer had heard about the lawsuit would not be sufficient to create a genuine dispute about her knowledge. However, given that Whitehead claims Fladhammer actually used the term "sue us" during their exchange, it is at least arguably reasonable for a jury to believe that Fladhammer was referring to Whitehead's lawsuit. As such, Whitehead's claim does not fail as a matter of law because Fladhammer did not know about this lawsuit alone.

Instead, his claim fails because no reasonable trier of fact could find that Fladhammer was responsible for Whitehead's September 9 termination.[8] "For a defendant to be liable under section 1983, she must be personally responsible for the alleged deprivation of the plaintiff's constitutional rights." *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citation omitted). "The personal involvement requirement is satisfied if the constitutional violation occurs at a defendant's direction or with her knowledge or consent." *Id.*

---

[8] Based on the evidence of record, the court would have expected defendants to attempt to rebut Whitehead's motivating factor argument by showing that he would have been terminated regardless of Fladhammer's statement because of his unsatisfactory performance. *See Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011) (defendant may defeat retaliation claim by showing "that the harm would have occurred anyway -- that is, even if there had not been a violation of the First Amendment -- and thus that the violation had not been a 'but for' cause of the harm, for which he is seeking redress"). However, since defendants do not assert this defense, and Whitehead had no opportunity to show pretext in response, the court will not resolve the claim on this basis.

While Whitehead contends that Fladhammer ordered Cross to direct Sieber to fire Whitehead, the undisputed evidence of record does not support this dubious claim. Even accepting Whitehead's assertion that he heard Fladhammer tell Cross to fire him, there is no evidence that either Cross or Fladhammer ever instructed Sieber to write the conduct report or conduct the work evaluation, much less proceed to fire plaintiff. On the contrary, Sieber denies it outright, and the evidence is overwhelming that he had initiated this process and followed through on his own with no knowledge of plaintiff's complaint about tainted peanut butter.

More importantly, it is undisputed that Fladhammer had no involvement in: (1) observing Whitehead's infraction on September 9 or issuing Whitehead the conduct report that day; (2) evaluating Whitehead's performance that day; or (3) terminating him. Instead, the evidence is again overwhelming that Sieber was responsible for all of the events that took place on September 9, and there is no evidence of record -- beyond Whitehead's speculation -- that Sieber's actions were in any way motivated by Fladhammer, much less his peanut butter complaints. Finally, it was June Trepis, not Fladhammer, who approved Sieber's decision to fire Whitehead.

While Whitehead insists that Fladhammer later "approved" the termination, the only evidence of record supporting that notion is the October 6, 2017, letter he received from NLCI's Correctional Management Services Director Sally Wess. Yet that letter says nothing about Fladhammer instructing or facilitating Whitehead's termination. Rather, Wess confirmed in the letter that Fladhammer was *not* part of the process on September 9, and only agreed that the termination was appropriate *after the fact* when Wess asked her about it. That Fladhammer later approved of Sieber's evaluation and termination as a

matter of formalizing Whitehead's termination as a Unit Manager in no way permits a reasonable jury to infer that she started the chain of events leading to plaintiff's termination in retaliation for his complaints about tainted peanut butter.

To the contrary, the *only* reasonable conclusion to be drawn from the evidence of record is that Sieber decided that Whitehead's conduct report for again smuggling food into his cell, along with a litany of other misconduct personally observed by Sieber over some six months, led to a review of his employment, which he unsurprisingly deemed to be wholly unsatisfactory. As such, even accepting Whitehead's testimony that Fladhammer made a comment suggesting that Whitehead would not be able to work for and sue NLCI employees, the evidence of record does not support a reasonable finding that Fladhammer was involved Whitehead's termination from his Personal Assistant 2 position. Accordingly, Fladhammer is entitled to judgment in her favor on this retaliation claim as well.

<center>ORDER</center>

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #54) is GRANTED.

2) The clerk of court is directed to enter final judgment in defendants' favor and close this case.

Entered this 21st day of January, 2020.

<div style="margin-left:40%">

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge
</div>